Carol MAJESKE, et al., Plaintiffs,

v.

CITY OF CHICAGO, Defendant.

No. 89 C 7262.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 25, 1998.

Ronald A. Bredemann, Crystal Lake, IL, Kimberly Ann Sutherland, Chicago, IL, for Julie Johnson, John Gargul, Carol Majeske, Fred L. Barham, Joanne Botwinski, Ellwood Brockman, Ray Broderdorf, Peter Bukiri, Michael Burke, William Coogan, Charlotte Danovaro, William Davis, James Duckhorn, Vito Ferro, Jeanette Flynn, Richard Francis, Dale Gatliff, James P. Haggard, John Hayes, Jeffrey Hoffmann, Maria Jacobson, Mary Ann Jankowski, Shirley Jobe, Kenneth Krok, Bruce Lipman, George Pinkiewicz, Patrick Scanlan, Peggy Jo Schulte, Cynthia Serafini, Emily Siwek, Carl Zancha, John Azara, Donald Barry, James Bartosik, Carolyn Burauer, Phillip Cappitelli, Michael Chevalier, Thomas Coughlin, Eugene Chudy, Robert Cooper, Robert Craig, Kevin Duffin, Michelle Enstrom, Gerald Ewalt, John Farrell, Lenore Flaherty, James Gantz, James Goga, Larry Goodson, Ron Grazianp, Michael Haas, Mi-

chael Harris, Bernadette Hellan, Kevin Howley, Kay Huff, Peggy Johnson, Stephen Joyce, Lawrence Knysch, David Koziol, Michael Lazzaro, William Looney, Lawrence Lynch, Neil Maas, Harold Matuszak, Donald McGrath, Richard McMahon, Bradon Medow, Laurence Nelson, Bohdan Olijnyk, John Posluszny, Leon Putrski, Edward Richards, David Rucci, Robert Slupski, Thomas Stachula, Pamela Triner, Edward Tomasik, Dale Vercruyse, Carlo Virgilio, James Wronowski.

Ronald A. Bredemann, Crystal Lake, IL, for Carol Zancha, Marie Jacobson, Nancy Bringe.

Kelly Raymond Welsh, Jay Michael Kertez, Laure Ann Mullaney, Mary Catherine Cox, Adrienne Hiegel, City of Chicago, Law Dept., Corporation Counsel, Chicago, IL, Sarah Vanderwicken, Despres, Schwatz & Geoghegan, Chciago, IL, Terrence J. Moran, Gessler, Flynn, Flesichmann, Hughes & Socol, Ltd., Chicago, IL, Adam M. Kingsley, Caroline Anne Nash, City of Chicago Corporation Counsel, Chicago, IL, Peter Scott Rukin, New York City, for City of Chicago, Illinois.

Kelly Raymond Welsh, Jay Michael Kertez, City of Chicago, Law Dept., Corporation Counsel, Chicago, IL, Sarah Vanderwicken, Despres, Schwatz & Geoghegan, Chicago, IL, for Leroy Martin, Edward Brooks, Hubert Holton, Jr., Glenn Carr.

Kelly Raymond Welsh, Jay Michael Kertez, City of Chicago, Law Dept., Corporation Counsel, Chicago, IL, Sarah Vanderwicken, Despres, Schwatz & Geoghegan, Chicago, IL, Terrence J. Moran, Gessler, Flynn, Flesichmann, Hughes & Socol, Ltd., Chicago, IL, for Charles Ford.

J. Paula Roderick, Earl L. Neal & Associates, Chicago, IL, Terrence J. Moran, Gessler, Flynn, Flesichmann, Hughes & Socol, Ltd., Chicago, IL, for Richard M. Daley, Gerald Cooper, Hubert Holton, Kelly R. Welsh, Susan Sher, Lawrence Rosenthal, Sarah Vanderwicken.

Stephen Jay Feinberg, Marvin Gittler, Asher, Gittler, Greenfield, Cohen & D'alba, Chicago, IL, for Fraternal Order of Police.

## MEMORANDUM AND ORDER

LINDBERG, District Judge.

Plaintiffs, white current and former Chicago police officers, brought this action against defendant, the City of Chicago, claiming they were discriminated against in the process the Chicago Police Department used for making promotions to detective in 1990. After lengthy pretrial proceedings, 83 plaintiffs remained. The matter was divided into several phases for the purpose of trial. See FRCP 42(b). Most of the promotions were based on the results of a promotional examination, from which a list ranked in order of performance on the examination was compiled. A significant minority of the promotions, however, were so-called "merit" promotions based upon an entirely different procedure having nothing to do with the examination. The first phase of the trial concerned only the examination-based promotions. The first phase was tried before a jury, which returned a special verdict in which it made findings of fact on 56 questions put to it. These questions were on 28 issues, with the jury first being asked whether defendant had presented any evidence in support of its side of the issue and then being asked whether plaintiffs had proved by a preponderance of the evidence their side of the issue. It is now for the court to determine, based on the jury's findings and the evidence adduced, the outcome of Phase I of the trial of this case.

The 1989 detective examination was to be conducted in two parts. The first was to be a multiple choice portion. In the second part, a limited number of those who took the multiple choice portion were to be invited to participate in an oral "work sample/assessment exercise."

The multiple choice portion of the examination was administered to 3392 candidates in April of 1989. The candidates received one point for each question answered correctly in this part of the examination, which resulted in a distribution in which applicants received scores between 33 and 94 points.

Defendant determined it would administer the oral portion of the examination to no more than 650 applicants. According to defendant, this was because defendant was go-

ing to administer the oral portion of the test to all applicants in a single day in order to preserve secrecy of the test questions. The site at which the test was to be held could only accommodate 325 applicants at a time, and the length of the oral portion of the test made it possible to test only two groups of applicants in a single day. Plaintiffs, pointing to a prior sergeants' promotional examination in which defendant administered an oral component to far more than 650 applicants, contend that this was not the true reason defendant limited the number of persons taking the oral portion of the examination to under 650.

The results of the written multiple choice portion of the examination were such that if the applicants with the top 650 multiple choice scores had been invited to take the oral portion of the examination, minority applicants would have been severely underrepresented in the oral-board pool relative to their presence in the multiple-choice pool. So, defendant divided the candidates into three groups based on their race and ethnicity—white, Hispanic, and black—and invited the applicants achieving the top 17% of scores from each group to take the oral portion of the examination. Invited to take the oral portion of the examination were white applicants achieving at least an 82, Hispanic applicants achieving at least a 78, and black applicants achieving at least a 73 on the multiple choice portion of the examination. This resulted in 619 candidates. If defendant had selected candidates strictly in rank order of their multiple choice scores, it would have used 80 as the cut-off score, since that would have resulted in 607 applicants advancing to the oral portion of the examination while a cut-off score of 79 would have resulted in 693 candidates advancing which was more than could be accommodated at the test site in a single day.

In June of 1989, the 619 candidates took the oral portion of the examination. The oral examination scores and the multiple choice examination scores were given equal weight in determining the final composite scores of the candidates. The 1990 eligibility list of officers for appointment to detective ranked the officers in numerical order in accordance with their final composite scores. When it came time to make the promotions, the candidates were promoted in the order in which they ranked on the 1990 eligibility list with the exception of 22 officers—18 black and 4 Hispanic officers—who were promoted out of rank order.

■■ It is undisputed that minority patrol officers received favorable treatment, African Americans on account of their race and Hispanics on account of · their ethnicity. (Since the distinction between racial and ethnic discrimination is of no moment in this case, this opinion will often use the terms "race" and "racial" to refer to both race and ethnicity.) Such treatment of white patrol officers is a denial of equal protection unless it can be justified under the standard known as "strict scrutiny." *McNamara v. City of Chicago,* 138 F.3d 1219, 1222 (7th Cir.1998). One justification that meets this standard is that the favored treatment is necessary to remedy unlawful past discrimination by the entity granting the favor. *McNamara v. City of Chicago,* 138 F.3d 1219, 1222 (7th Cir. 1998). This justification requires proof that defendant engaged in racial and ethnic discrimination in the employment of police officers in the past, and also that the remedy is narrowly tailored to the violation. *McNamara v. City of Chicago,* 138 F.3d 1219, 1222 (7th Cir.1998). As a practical matter, a remedy must discriminate against whites as little as possible consistent with effective remediation for it to be narrowly tailored. *McNamara v. City of Chicago,* 138 F.3d 1219, 1222 (7th Cir.1998).

■■ Defendant initially has the burden of production with respect to this issue. Defendant must establish that there exists a strong basis in evidence for its conclusion that remedial action was necessary. *Concrete Works of Colorado v. City and County of Denver,* 36 F.3d 1513, 1521 (10th Cir.1994), citing *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), and *Wygant v. Jackson Board of Education,* 476 U.S. 267, 277, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (plurality opinion). In *McNamara,* the Seventh Circuit found a combination of statistical evidence of underrepresentation of racial minorities compared to the relevant group of applicants and anecdotal evidence of discrimination sufficient to

support a district court's conclusion that a defendant had satisfied this burden. See *McNamara v. City of Chicago*, 138 F.3d 1219, 1223–24 (7th Cir.1998). Whether a strong basis in evidence of past discrimination exists, which would establish a compelling interest for defendant to use race-conscious measures in its promotion procedures, is a question of law. See *Concrete Works of Colorado v. City and County of Denver*, 36 F.3d 1513, 1522 (10th Cir.1994). That legal conclusion, however, must be based upon factual determinations about the accuracy and validity of defendant's evidentiary support for its program. See *Concrete Works of Colorado v. City and County of Denver*, 36 F.3d 1513, 1522 (10th Cir.1994).

Although defendant has the initial burden of production, the burden of proof remains with plaintiffs to establish the unconstitutionality of the affirmative action taken in the detective promotions at issue in this case. See *Concrete Works of Colorado v. City and County of Denver*, 36 F.3d 1513, 1522 (10th Cir.1994). This means that if defendant presented a strong basis in evidence for its conclusion that remedial action was necessary, it then was plaintiffs' burden to establish that defendant's evidence did not constitute strong evidence of discrimination or that the remedy employed by defendant was not narrowly tailored to the violation. See *Concrete Works of Colorado v. City and County of Denver*, 36 F.3d 1513, 1523 (10th Cir.1994); *McNamara v. City of Chicago*, 138 F.3d 1219, 1222 (7th Cir.1998).

In this case, a jury tried the issues of fact. Because of the way in which legal and factual issues are intertwined in the determination of whether defendant's race-conscious actions were justified by a compelling interest, a special verdict was employed to obtain the findings of fact from the jury. Under this procedure, each party waived the right to a trial by jury of any issue omitted from the special verdict unless before the jury retired the party demanded the submission of the issue to the jury. FRCP 49(a). On any issue omitted without demand, the court may make a finding. FRCP 49(a). If the court fails to make such a finding, it is deemed to have made a finding in accord with the judgment on the special verdict. FRCP 49(a).

The first question then is whether defendant established a strong basis in evidence that remedial action was necessary. In its special verdict, the jury answered each of the following questions in the affirmative:

1. Did the City present evidence to support its assertion that if it had used the same multiple choice cut-scores for all officers who took the first part of the 1989 detective examination, the results of the multiple choice section would have had an adverse impact against black and Hispanic detective candidates?

2. Did the City present evidence to support its claim that the written multiple choice section did not test for all of the qualities that make a good detective?

3. Did the City present evidence to support its claim that the written multiple choice section could not, by itself, accurately predict which candidates would perform better as detectives?

4. Did the City present evidence to support its claim that it used three different cut-scores to comply with what it believed was federal law and to avoid a lawsuit that could have been brought by the federal government or by black and Hispanic officers?

5. Did the City present evidence to support its claim that, in the decades prior to the 1989 detective examination, black police officers were subject to intentional, unfavorable treatment in assignments (for example, segregated beats, restricted duties, and unfair efficiencies)?

6. Did the City present evidence to support its claim that, in the decades prior to the 1989 detective examination, black and Hispanic police officers were subject to intentional, unfavorable treatment in hiring (for example, in the use of medical and entrance qualifications)?

7. Did the City present evidence to support its claim that, in the decades prior to the 1989 detective examination, supervisors (for example, ser-

geants, lieutenants, commanders, etc.) in the Police Department acted in ways that were hostile to black and Hispanic police officers?

7.5. Did the City present evidence to support its claim that, in the decades prior to the 1989 detective examination, the Police Department tolerated acts of hostility directed towards black and Hispanic police officers?

8. Did the City present evidence to support its claim that in 1990 the percent of black and Hispanic officers in the detective rank was significantly lower than the percent of black and Hispanic officers in the patrol officer rank?

9. Did the City present evidence to support its claim that it was very unlikely that there would have been as few black and Hispanic detectives in 1990 if blacks and Hispanics had been hired onto the police force and promoted to detective in the same manner as whites?

10. Did the City present evidence to support its claim that there would have been at least 18 more black detectives and 4 more Hispanic detectives in 1990 if blacks and Hispanics had been hired onto the police force and promoted to detective in the same manner as whites?

11. Did the City present evidence to support its belief that the underrepresentation of black and Hispanic detectives was due, at least in part, to the Police Department's prior unfavorable treatment of black and Hispanic officers or persons?

18. Did the City present evidence to support its claim that use of three different cut-scores helped to address the lingering effects of the Police Department's prior discriminatory practices by providing an opportunity for a greater number of black and Hispanic officers to compete for a spot as detective?

Coupled with each of these questions, was a question asking whether plaintiffs had proved by a preponderance of the evidence the negative of the proposition, which in the case of each of these questions the jury answered no. Therefore, the jury found that defendant presented evidence of past discrimination leading to an underrepresentation of blacks and Hispanics as detectives, and that plaintiffs did not prove any of the contrary propositions by a preponderance of the evidence.

There were two questions of potential relevance to whether defendant met its burden to which the jury answered "no:"

5.5. Did the City present evidence to support its claim that, in the decades prior to the 1989 detective examination, black police officers were subject to intentional, unfavorable treatment in assignments (for example, segregated beats, restricted duties, and unfair efficiencies) and that this caused black police officers to be excluded from the opportunity to become detectives?

7.75. Did the City present evidence to support its claim that, in the decades prior to the 1989 detective examination, supervisors (for example, sergeants, lieutenants, commanders, etc.) in the Police Department acted in ways that were hostile to black and Hispanic police officers and that this caused black and Hispanic officers to be excluded from the opportunity to become detectives?

These answers are not inconsistent with the other answers. It can be inferred that the jury believed that while not making it impossible, past discrimination did make it more difficult for black and Hispanic officers than it was for white officers to become detectives.

Thus the jury found defendant presented evidence of past discrimination in the hiring and promotion to detective of Chicago police officers. In addition, the jury found that while defendant did not present evidence that blacks and Hispanics were wholly excluded from the opportunity to become detectives, defendant did present evidence that blacks and Hispanics were underrepresented in the ranks of detectives and evidence that this underrepresentation was caused by prior discrimination. In addition, the jury found defendant presented evidence that the re-

sults of the multiple choice portion of the test, if used without the race-based cut-scores, would have had an adverse impact against black and Hispanic officers, that the multiple choice portion of the test did not test for all of the qualities that make a good detective, and that the multiple choice portion of the test could not by itself accurately predict which candidates would perform better as detectives. Based upon the jury's findings and the evidence underlying those findings, the court finds defendant had a strong basis in evidence for concluding past discrimination existed and race-conscious action was necessary to remedy that discrimination. Accordingly, it is plaintiffs' burden to establish that defendant's evidence did not constitute strong evidence of discrimination or that the remedy employed by defendant was not narrowly tailored to the violation. See *Concrete Works of Colorado v. City and County of Denver*, 36 F.3d 1513, 1523 (10th Cir.1994); *McNamara v. City of Chicago*, 138 F.3d 1219, 1222 (7th Cir.1998).

The jury found plaintiffs failed to prove by a preponderance of the evidence any of the facts set forth in the special verdict relevant to the question of whether there was strong evidence of discrimination. Plaintiffs accordingly have not borne their burden of establishing that defendant's evidence did not constitute strong evidence of discrimination.

■ Even so, plaintiffs could still prevail if they were to prove that the remedy employed by defendant was not narrowly tailored to the violation. One of the contentions raised by plaintiffs in this regard concerns the basis on which defendant decided to give the oral portion of the examination to only 619 of the candidates, selected on the basis of the race-conscious cut-scores. Defendant contends that the reasons only 619 candidates were permitted to take the oral portion of the examination were race-neutral. According to defendant, the limitation in number was because defendant wished to give the oral portion of the examination in a single day, and at a single location, which could only accommodate a maximum of 650. Plaintiffs contend it was done to favor blacks and Hispanics. The jury answered no to the question:

    4.5.  Did the City present evidence that its decision to limit the number of per-

sons taking the oral board to 619 candidates was made on a race neutral basis?

But also answered no to the question:

    4.5A.  Did plaintiffs prove by a preponderance of the evidence that the City's decision to limit the number of persons taking the oral board to 619 candidates was not made on a race-neutral basis?

Thus, plaintiffs failed to prove that the limitation of the number of persons taking the oral portion of the examination to 619 was made on a race-conscious basis.

The identity of the 619 who went on to take the oral boards was determined by defendant's admittedly race-conscious cut-scores. The jury answered "no" to the following questions:

    17A.  Did plaintiffs prove by a preponderance of the evidence that use of three different cut-scores did not eliminate the multiple choice section's adverse impact against black and Hispanic officers?

    19A.  Did plaintiffs prove by a preponderance of the evidence that the City had an alternative, non-race-based measure that would have been equally effective in eliminating the multiple choice section's adverse impact against black and Hispanic officers?

    19.5A.  Did plaintiffs prove by a preponderance of the evidence that the City did not explore race-neutral alternatives to improve the performance of blacks and Hispanics on the detectives test, such as setting up courses to learn the knowledge, skills, and abilities for the position, and such as giving the tests more frequently?

In addition, after the oral portion of the examination, defendant selected out of rank order 18 black and 4 Hispanic candidates for promotion to detective on the basis of their race and ethnicity. The ultimate result then of the race-conscious measures taken by defendant was to promote 18 more black and 4 more Hispanic candidates to detective than

would have been promoted otherwise. The jury answered "no" to the questions:

8A. Did plaintiffs prove by a preponderance of the evidence that in 1990 the percent of black and Hispanic officers in the detective rank was not significantly lower than the percent of black and Hispanic officers in the patrol officer rank?

9A. Did plaintiffs prove by a preponderance of the evidence that it was likely that there would have been as few black and Hispanic detectives in 1990 if blacks and Hispanics had been hired onto the police force and promoted to detective in the same manner as whites?

10A. Did plaintiffs prove by a preponderance of the evidence that there would not have been at least 18 more black and 4 more Hispanic detectives in 1990 if blacks and Hispanics had been hired onto the force and promoted to detective in the same manner as whites?

From these findings the court concludes plaintiffs failed to prove that either the use of the cut-scores or the out-of-rank promotions were not narrowly tailored to remedy the past discrimination. The jury's findings establish that the out-of-rank order promotion of 18 black officers and 4 Hispanic officers constituted a plausible lower-bound estimate of the shortfall in minority representation among detectives that was due to the police department's intentional discrimination in the past. See *McNamara v. City of Chicago*, 138 F.3d 1219, 1224 (7th Cir.1998). Therefore, the court finds that the remedy selected by defendant discriminated as little against whites as possible consistent with effective remediation, and so was narrowly tailored to the violation. See *McNamara v. City of Chicago*, 138 F.3d 1219, 1222 (7th Cir.1998).

Defendant is accordingly entitled to prevail on the basis of its affirmative defense that the race-conscious measures it undertook were necessary to remedy past discrimination. It is unnecessary to determine whether defendant would also be entitled to prevail on its other two defenses—that the race-conscious measures were justified in order to avoid a Title VII lawsuit and that those measures were justified on the basis of the operational necessity of the police department.

This result obviates the need for the contemplated Phase II regarding plaintiffs' damages. Therefore, defendant's Rule 50(a) motion concerning the standing of particular plaintiffs to participate in Phase II is moot.

ORDERED: Defendant, the City of Chicago, is entitled to judgment on plaintiffs' claims arising from the 1989 detectives promotional examination and the 1990 promotions to detective made from the 1990 eligibility list based on that examination. As plaintiffs' merit promotions claim remains pending, judgment will not be entered at this time.

Defendant's motion for judgment as a matter of law [438] is denied as moot.