In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1411 & 99-3639

Carol Majeske, et al.,

Plaintiffs-Appellants,

v.

City of Chicago,

Defendant-Appellee.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 89 C 7262--George W. Lindberg, Judge.

Argued April 21, 2000--Decided July 10, 2000

Before Bauer, Kanne, and Evans, Circuit Judges.

Bauer, Circuit Judge.  The plaintiffs in this
case are 83 white police officers who work for
the Chicago Police Department ("CPD") and sought,
but did not receive, promotions to the position
of detective. Plaintiffs sued the City of Chicago
for reverse discrimination claiming that the
CPD's affirmative action plan violated their
rights because it resulted in the promotion of
African-Americans and Hispanics instead of them.
The case went to trial before a jury which made
factual findings by answering 56 special
interrogatories. After reviewing the jury's
findings of fact, the district court entered
judgment in the City's favor and found the
affirmative action plan constitutional.
Plaintiffs challenge this judgment, and in a
separate appeal consolidated with this one, ask
us to reverse the district court's order
requiring plaintiffs to pay the City's costs. We
affirm the district court in both cases.

I.  Background

   The facts of this case date back to 1989 when
the CPD administered a test to determine which
Chicago police patrol officers would be promoted
to the position of detective. The 1989 detective
test had two components-- the first was a written
job knowledge multiple choice test and the second

an oral examination. The CPD used the written test to whittle down the number of patrol officers that it allowed to take the oral exam. A total of 3,392 applicants took the written test, but a maximum of 650 individuals were selected to take the oral exam. This number would produce more than enough candidates to fill the expected number of vacant detective positions. The CPD also limited the number of people allowed to take the oral exam due to space limitations at the testing facility and concerns about maintaining the secrecy of the test questions.

After reviewing the results of the written exam, the CPD concluded that advancing applicants based solely on ranking in the written test would significantly reduce the number of African-American and Hispanic applicants eligible for promotion to detective. Believing that this would expose it to liability for discriminating against blacks and Hispanics, the CPD developed a plan to increase the number of minorities promoted to detective. The CPD divided all of the candidates into three groups--white, African-American, and Hispanic. The CPD then invited the individuals that scored in the top 17% on the written test from each group to take the oral exam. This approach resulted in different cut-off scores for members of each group. The cut-off score for whites was 82, while Hispanic applicants advanced to the oral exam if they scored 79 and African-American candidates advanced if they scored a 73 or higher. Using this approach, the CPD allowed 619 applicants to take the oral examination.

On June 24, 1989, the CPD administered the oral component of the detective test to the 619 candidates and determined final scores by combining the written and oral scores and weighting the two scores equally. The Department used these final scores to create a list of applicants that the CPD determined were eligible for promotion to detective ("the eligibility list"). The eligibility list ranked the individuals based on their final composite score.

More than a year after administering the oral test and creating the eligibility list, the CPD promoted 64 officers to detective in August 1990. The top 42 people on the eligibility list were promoted to detective in rank order from the list, but the other 22 promotions were made out of rank order and were given to the 18 highest scoring African-American and 4 highest scoring Hispanic candidates. In addition to these 64 promotions, the CPD also promoted 26 patrol officers based solely on merit.

The Fraternal Order of Police ("FOP") filed grievances on behalf of patrol officers who had

not been promoted, claiming that the out-of-rank and merit promotions violated the collective bargaining agreement between the CPD and the FOP. On October 31, 1991, an arbitrator found that the out-of-rank detective promotions given to the African-American and Hispanic officers violated the collective bargaining agreement, but that the merit-based promotions did not. In response to the arbitration, the CPD made 37 additional detective promotions on March 13, 1992. The Department made these additional promotions in rank order from the eligibility list and this resulted in the top 90 candidates from that list having all been promoted to detective.

Plaintiffs filed a two-count complaint in the district court against the City of Chicago claiming that the CPD's promotion of African-Americans and Hispanics out of rank order violated their rights under the Equal Protection Clause of the Fourteenth Amendment, actionable under 42 U.S.C. sec. 1983. Plaintiffs also asserted a supplemental claim that the promotions violated the Chicago Municipal Code. Before trial, the City stipulated that race and national origin were factors in the promotions resulting from the 1989 detective tests, but argued that the CPD's affirmative action plan was nevertheless constitutional. Based on this admission, the parties agreed to divide the trial into three phases. Phase one of the trial was limited to the question of whether the CPD's affirmative action plan was constitutional. The plaintiffs agreed that if they lost the first phase of the trial, they would not pursue the next two phases which were to address the merit promotions and damages.

As it turned out, the plaintiffs did lose phase one of the trial. After hearing all of the evidence during a lengthy trial, a jury answered 56 special interrogatories--the overwhelming majority of which were answered in the City's favor. Judge Lindberg reviewed the jury's answers and entered judgment for the City on plaintiffs' equal protection claim. The district court also denied plaintiffs' post-trial motions, dismissed plaintiffs' other claims pursuant to the agreement, and entered an order requiring plaintiffs to pay the City's bill of costs. Plaintiffs now appeal the judgment against them on their equal protection claim and the order that they pay the City's costs.

II.  Analysis

Because this case concerns actions by a local government that were admittedly influenced by race and national origin,[1] we must apply strict scrutiny when reviewing the City's affirmative

action plan. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 222 (1995); Billish v. City of Chicago, 989 F.2d 890, 893 (7th Cir. 1993) (en banc). To survive strict scrutiny, a race-based classification must promote a compelling governmental interest. See Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia, 91 F.3d 586, 596 (3d Cir. 1996); Wittmer v. Peters, 87 F.3d 916, 918-19 (7th Cir. 1996). It is well-settled law in this Circuit that a governmental agency has a compelling interest in remedying its previous discrimination and the agency may use racial preferencing to rectify that past conduct. See McNamara v. City of Chicago, 138 F.3d 1219, 1221 (7th Cir. 1998); People Who Care v. Rockford Bd. of Educ., 111 F.3d 528, 535 (7th Cir. 1997); Wittmer, 87 F.3d at 918; Billish, 989 F.2d at 893; Milwaukee Cty. Pavers Assoc. v. Fielder, 922 F.2d 419, 421 (7th Cir. 1991). However, the government must show real evidence of past discrimination and cannot rely on conjecture. McNamara, 138 F.3d at 1222.

In addition to showing hard proof of a compelling interest, strict scrutiny requires the government to come forward with evidence that its affirmative action plan is narrowly tailored. Adarand, 515 U.S. at 235. An affirmative action plan is narrowly tailored if, as a practical matter, "it discriminates against whites as little as possible consistent with effective remediation." McNamara, 138 F.3d at 1222. Once the governmental entity has shown acceptable proof of a compelling interest in remedying past discrimination and illustrated that its plan is narrowly tailored to achieve this goal, the party challenging the affirmative action plan bears the ultimate burden of proving that the plan is unconstitutional. Aiken v. City of Memphis, 37 F.3d 1155, 1162 (6th Cir. 1994); Concrete Works of Colo., Inc. v. City and Cty. of Denver, 36 F.3d 1513, 1521 (10th Cir. 1994).

Whether there is enough evidence to support a finding of a compelling governmental interest and thereby justify a race-conscious action is a question of law that we review de novo. Contractors Ass'n of E. Pa., 91 F.3d at 596; Concrete Works of Colorado, 36 F.3d at 1522. Similarly, we apply plenary review to the issue of whether the City's affirmative action plan was narrowly tailored. Contractors Ass'n of E. Pa., 91 F.3d at 596. Finally, since the City prevailed at trial, we will view the facts in the light most favorable to the City and draw all reasonable inferences in its favor. See McNamara, 138 F.3d at 1223.

A.  Compelling Governmental Interest

During trial, the City presented persuasive statistical evidence that past discrimination by the CPD in the hiring and promotion of African-American and Hispanic police officers reduced the number of black and Hispanic detectives on the police force in 1989. Rather than restate the extensive statistical data presented at trial, we will simply summarize the highlights of that evidence. Dr. Charles Mann, who qualified as an expert in statistics and the statistical analysis of employment matters, testified that he examined the CPD's racial composition, hiring, and promotion practices from 1950 through 1991. Using the total number of blacks and Hispanics in the available work force, as well as the number of blacks and Hispanics in the patrol officers' ranks at the CPD, Dr. Mann's study showed that the CPD's past hiring of African-Americans and Hispanics was substantially lower than it statistically would have been indicated. Dr. Mann testified that past promotions of African-Americans and Hispanics to detective were also substantially below what statistical analysis predicted. Dr. Mann created a statistical model to predict the expected number of African-American and Hispanic detectives there would have been in the CPD absent past discrimination. Based on this model, Dr. Mann calculated that in 1989 there should have been 221 African-American detectives, but there were only 57. Similarly, Dr. Mann testified that under his analysis there should have been approximately 43 Hispanic detectives, but a count revealed there were only 9. Dr. Mann testified that the low number of black and Hispanic detectives was caused by the CPD's past discrimination in hiring and promotion of these two groups.

The jury also heard testimony from several minority witnesses who told of past discrimination they experienced while working for the CPD. These individuals testified about the CPD's past use of pretextual medical excuses such as flat feet and heart murmurs to disqualify African-Americans from becoming police officers. The jury learned about the CPD's past use of invalid height and weight requirements to exclude Hispanic applicants from joining the police force. In the event that the CPD did hire an African-American, those officers were assigned exclusively to African-American neighborhoods and were forbidden from patrolling white neighborhoods or arresting white suspects. African-American officers received the most menial jobs even though they were trained to perform tasks involving much higher degrees of responsibility. For example, one black officer trained to investigate traffic accidents was relegated to directing traffic and another black

patrol officer who was qualified for desk duty was assigned to starting cars. African-American officers received artificially low efficiency ratings compared to their white colleagues and were frequently transferred without notice. African-American employees of the CPD also told the jury about the climate of racial hostility and segregation they endured on the job. The washroom walls were covered with offensive, racist, and threatening graffiti, and CPD supervisors took no action to correct the problem.

After hearing the statistical and anecdotal evidence of discrimination, the jury was given a special verdict form pursuant to Rule 49(a) of the Federal Rules of Civil Procedure. The verdict form contained 56 questions, of which the jury answered "yes" to the following critical interrogatories:

Did the City present evidence to support its claim that, in the decades prior to the 1989 detective examination, black police officers were subject to intentional, unfavorable treatment in assignments (for example, segregated beats, restricted duties, and unfair efficiencies)?

Did the City present evidence to support its claim that, in the decades prior to the 1989 detective examination, black and Hispanic police officers were subject to intentional, unfavorable treatment in hiring (for example, in the use of medical and entrance qualifications)?

Did the City present evidence to support its claim that, in the decades prior to the 1989 detective examination, supervisors (for example, sergeants, lieutenants, commanders etc.) in the Police Department acted in ways that were hostile to black and Hispanic police officers?

Did the City present evidence to support its claim that, in the decades prior to the 1989 detective examination, the Police Department tolerated acts of hostility directed towards black and Hispanic police officers?

Did the City present evidence to support its claim that in 1990 the percent of black and Hispanic officers in the detective rank was significantly lower than the percent of black and Hispanic officers in the patrol officer rank?

Did the City present evidence to support its claim that it was very unlikely that there would have been as few black and Hispanic detectives in 1990 if blacks and Hispanics had been hired onto the police force and promoted to detective in the same manner as whites?

Did the City present evidence to support its claim that there would have been at least 18 more black detective and 4 more Hispanic detectives in 1990 if blacks and Hispanics had been hired onto the police force and promoted to detective in the same manner as whites?

Did the City present evidence to support its belief that the under representation of black and Hispanic detectives was due, at least in part, to the Police Department's prior unfavorable treatment of black and Hispanic officers or persons?

Did the City present evidence to support its claim that use of three different cut-scores helped to address the lingering effects of the Police Department's prior discriminatory practices by providing an opportunity for a greater number of black and Hispanic officers to compete for a spot as detective?

Along with each of these questions, the verdict form posed a question asking the jury whether the plaintiffs had proved the opposite proposition by a preponderance of the evidence. In response to each of those questions, the jury said "no."

Based on the evidence presented at trial and the jury's factual findings, we agree with the district court that there was sufficient proof of past discrimination by the City to warrant the affirmative action plan in this case. The statistical proof revealed that past discrimination significantly lowered the number of African-Americans and Hispanics that were promoted to detective through the years. Similarly, the jury heard extensive testimony from former minority members of the CPD about the discriminatory practices the CPD used to keep blacks and Hispanics from being hired into the department; and, if a minority did manage to get a job, how they were prevented from advancing within the CPD. We have previously held that this combination of persuasive statistical data and anecdotal evidence adequately establishes a compelling governmental interest that justifies an affirmative action plan, see McNamara, 138 F.3d at 1223-24, and we do so again in this case.

The only credible argument plaintiffs advance to suggest that there was not enough evidence of past discrimination to warrant the affirmative action plan is based on two answers the jury gave to special interrogatories. Specifically, the jury answered "no" to the following two questions:

Did the City present evidence to support its

claim that, in the decades prior to the 1989 detective examination, black police officers were subject to intentional, unfavorable treatment in assignments (for example, segregated beats, restricted duties, and unfair efficiencies) and that this caused black police officers to be excluded from the opportunity to become detectives?

Did the City present evidence to support its claim that, in the decades prior to the 1989 detective examination, supervisors (for example, sergeants, lieutenants, commanders etc.) in the Police Department acted in ways that were hostile to black and Hispanic police officers and that this caused black and Hispanic officers to be excluded from the opportunity to become detectives?

According to plaintiffs, the negative responses to these two questions show that the jury rejected the City's evidence that past discrimination was the reason for the unusually low number of African-American and Hispanic detectives.

   We are not persuaded by plaintiffs' argument. The most compelling reason to reject this argument is that, in other questions, the jury specifically said that past discrimination had reduced the number of African-American and Hispanic detectives at the CPD. The jury responded "yes" to the following three questions:

Did the City present evidence to support its claim that it was very unlikely that there would have been as few black and Hispanic detectives in 1990 if blacks and Hispanics had been hired onto the police force and promoted to detective in the same manner as whites?

Did the City present evidence to support its claim that there would have been at least 18 more black detective and 4 more Hispanic detectives in 1990 if blacks and Hispanics had been hired onto the police force and promoted to detective in the same manner as whites?

Did the City present evidence to support its belief that the under representation of black and Hispanic detectives was due, at least in part, to the Police Department's prior unfavorable treatment of black and Hispanic officers or persons?

   The jury's answers to these three questions are at odds with its responses to the previous two interrogatories. When a jury returns a special verdict that contains contradictory answers, "we should do what we can to save the verdict against

the spectre of inconsistency." American Gas Co. v. B. Cianciolo, Inc., 987 F.2d 1302, 1306 (7th Cir. 1993). Therefore, if there is a reasonable way to interpret the jury's verdict that resolves the inconsistency, the verdict must be construed in that manner. Freeman v. Chicago Park Dist., 189 F.3d 613, 615 (7th Cir. 1999) (quoting Gallick v. Baltimore & Ohio R.R. Co., 372 U.S. 108, 119 (1963)).

As the district court held, the inconsistency in this verdict can be reconciled. The two questions relied on by plaintiffs asked whether the CPD's prior acts of discrimination "caused black [and Hispanic] police officers to be excluded from the opportunity to become detectives?" Because these questions asked whether discrimination "caused black [and Hispanic] police officers to be excluded" rather than whether discrimination "caused some black [and Hispanic] police officers to be excluded," the jury could have reasonably interpreted the questions to ask whether the CPD's prior discrimination categorically prevented all black and Hispanic police officers from ever having the opportunity to become detectives. While this is a reasonable interpretation of these questions, this notion was contradicted by undisputed evidence at trial which clearly demonstrated that some blacks and Hispanics were promoted to detective before the 1989 detective test. Accordingly, if the jury construed these two questions as asking whether the CPD completely precluded minorities from becoming detectives, then the jury's answer of "no" is logical and supported by the evidence.

When construed in this manner, the answers to these two questions are entirely consistent with the jury's opposing responses to the later three questions. These three questions could not be construed as asking whether past discrimination completely prevented all blacks and Hispanics from ever becoming detectives. Instead, they focused on the actual and measurable impact previous discrimination had on the number of African-American and Hispanic detectives on the police force. For example, one question asked whether previous discrimination made it "very unlikely that there would have been as few black and Hispanic detectives in 1990." Another asked whether, absent the previous discrimination, "there would have been at least 18 more black detectives and 4 more Hispanic detectives in 1990." The other question posed the issue of whether prior discrimination caused "the under representation of black and Hispanic detectives." The jury responded affirmatively to each of these questions and therefore concluded that previous discrimination did reduce the number of black and

Hispanic detectives at the CPD. Because the jury's responses to the special interrogatories can be reasonably viewed as consistent, we reject plaintiffs' argument.


   B.  Narrow Tailoring


   To determine whether an affirmative action plan is narrowly tailored, the test we use is whether the racially preferenced measure is "a plausible lower-bound estimate of a shortfall in minority representation" that is caused by past discrimination. McNamara, 138 F.3d at 1224. The statistical evidence credited by the jury at trial indicates that the CPD's affirmative action plan was a modest solution to a history of discrimination that caused a significant under representation of minorities in the ranks of detectives. In 1989, there were only 57 African-American and 9 Hispanic detectives at the CPD. Dr. Mann predicted that, given the appropriate labor pool and absent past discrimination, there would have been 221 black and 43 Hispanic detectives on the police force in 1989. Thus, the detective ranks at the CPD have been under represented by 164 black detectives and 34 Hispanic detectives. Considering these alarming disparities, the City's promotion of only 18 blacks and 4 Hispanics to detective easily satisfies our requirement that an affirmative action remedy reflect a reasonable low-end estimate of the number of minorities affected by past discrimination.

   Aside from the stark numbers, the record contains other evidence which illustrates that the CPD's affirmative action plan was narrowly tailored. See United States v. Paradise, 480 U.S. 149, 171 (1987) (plurality opinion listing factors to consider when determining whether an affirmative action plan is narrowly tailored). First, the necessity for this affirmative action was firmly rooted in both the anecdotal and statistical evidence adduced at trial. The CPD had discriminated in hiring and promotion against blacks and Hispanics in the past and failure to use out of rank promotions in 1990 would have simply perpetuated minority under representation caused by past discrimination. The CPD employed this remedial measure for only one detective promotion and the preferences had a minimal impact on white officers. The evidence showed that using different cut-off scores on the written exam affected less than 5% of the white candidates who took the test and did not prevent any white officer from receiving a future promotion. In fact, all 22 white officers who were affected by the out-of-rank promotions were later promoted to detective and received back

pay. In view of these facts and the statistical evidence, we find ample proof to sustain the district court's finding that the CPD's affirmative action plan was narrowly tailored./2

C. Costs

After prevailing at trial, the City filed its amended bill of costs seeking $53,302 in costs but plaintiffs contested that amount and filed a motion to review the bill of costs. The district court reduced the amount of costs by $15,149 and awarded the City a total of $38,153 for its litigation costs. Plaintiffs now challenge the district judge's order. Two of plaintiffs' arguments merit our attention.

Rule 54(d) of the Federal Rules of Civil Procedure provides that "costs other than attorney's fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Taxing costs against a losing party requires two inquiries: (1) whether the cost imposed on the losing party is recoverable and (2) if so, whether the amount assessed for that item was reasonable. See Weeks v. Samsung Heavy Indus. Co., Ltd., 126 F.3d 926, 945 (7th Cir. 1997). "[W]e review carefully whether an expense is recoverable, but when we determine that it is, we defer to the district court, which is in the best position to determine the reasonableness of the cost." SK Hand Tool Corp. v. Dresser Indus., Inc., 852 F.2d 936, 943 (7th Cir. 1988). If there is statutory authority for taxing a specific cost, "we will not overturn a district court's decision that the cost was necessary to the litigation or its determination of what amount is reasonable absent a showing of clear abuse of discretion." Weeks, 126 F.3d at 945. We review an award of costs bearing in mind that there is a heavy presumption in favor of awarding costs to the prevailing party. See M.T. Bonk Co. v. Milton Bradley Co., 945 F.2d 1404, 1409 (7th Cir. 1991); Congregation of the Passion, Holy Cross Province v. Touch, Ross & Co., 854 F.2d 219, 222 (7th Cir. 1988).

Plaintiffs first contend that the district court erroneously awarded the City more than $22,000 to cover the costs of obtaining daily trial transcripts and transcripts from other court proceedings. According to plaintiffs, these costs were not appropriate because the City obtained the transcripts solely "for the convenience of counsel."

A court may tax as costs the "fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case." 28 U.S.C. sec. 1920(2). We have long

recognized that this includes trial transcripts and transcripts from other court proceedings necessarily obtained for use in the case. Weeks, 126 F.3d at 945; SK Hand Tool Corp., 852 F.2d at 943-44; State of Illinois v. Sangamo Constr. Co., 657 F.2d 855, 867 (7th Cir. 1981); Wahl v. Carrier Mfg. Co., Inc., 511 F.2d 209, 217 (7th Cir. 1975). While the determination of necessity must be made in light of the facts known when the transcript was requested, the introduction of testimony from a transcript is not a prerequisite for finding that it was necessary. See Cengr v. Fusibond Piping Sys., Inc., 135 F.3d 445, 455 (7th Cir. 1998); Hudson v. Nabisco Brands, Inc., 758 F.2d 1237, 1243 (7th Cir. 1985). And, although "courts may not tax the costs of transcripts . . . provided merely for the convenience of the requesting attorney," Barber v. Ruth, 7 F.3d 636, 645 (7th Cir. 1993), a transcript need not be "absolutely indispensable in order to provide the basis of an award of costs." Id. Whether a party obtained a transcript out of convenience or necessity for use in the case is a question of fact that we will not disturb absent clear error. Callicrate v. Farmland Indus., Inc., 139 F.3d 1336, 1340 (10th Cir. 1998); Weeks, 126 F.3d at 945;10 James William Moore, Moore's Federal Practice, sec. 54.103[3][e] (3d ed. 1998).

Plaintiffs claim that the district court erred in its factual determination that the City obtained the transcripts necessarily for use in the case rather than for the convenience of its lawyers. While the district court's order does not explicitly find that the City obtained transcripts for use in the case, the facts before the trial court amply support this conclusion. The City told the district court that it used the transcripts to record the court's oral rulings before and during trial, to prepare pre-trial and trial memoranda, to prepare direct examination questions for its witnesses, to anticipate cross-examination questions, to cross-examine plaintiffs' witnesses, to draft its post-trial briefs, and to respond to plaintiffs' post trial motions. The district court must have known that the City actually used these transcripts for the case as the City attached hundreds of pages of the transcripts to memoranda filed with the district court. Because the district court was necessarily aware of facts which illustrate that the City obtained the transcripts for use in the case, we find no error in the district court's decision to award the City its costs for trial transcripts./3

Plaintiffs also challenge the costs levied for the City's out-of-town witnesses's hotel rooms and travel expenses. In support of this argument,

plaintiffs say that the costs imposed are ones "which the statute does not allow." Contrary to plaintiffs' position, there is statutory authorization for these costs. Collectively, 28 U.S.C. sec.sec. 1821 and 1920(3) authorize the award of costs to reimburse witnesses for their reasonable travel and lodging expenses. Holmes v. Cessna Aircraft Co., 11 F.3d 63, 64-65 (5th Cir. 1994); Barber, 7 F.3d at 645; Chicago College of Osteopathic Med. v. George A. Fuller Co., 801 F.2d 908, 910 (7th Cir. 1986). Plaintiffs' argument on this point is therefore inaccurate. It appears that plaintiffs probably intended to assert that the costs taxed against them were unreasonable, but they lose on this point, too. The district court expressly found the costs for these witnesses to be reasonable and the plaintiffs have failed to show us any reason why that determination constitutes an abuse of discretion./4

III.  Conclusion

   The decisions of the district court in both appeals are affirmed.

/1 Although the City's actions in this case favored African-Americans because of their race and Hispanics because of their national origin, we will use the term "race" to refer to both groups; governmental preferences based on either race or national origin are subject to the same analysis. See Billish v. City of Chicago, 989 F.2d 890, 893 (7th Cir. 1993).
/2 We have considered the other arguments raised in plaintiffs' brief but find them unworthy of discussion other than to say that we find no reversible error in the district court's rulings.

/3 Plaintiffs also complain that the City did not need to obtain transcripts of the entire trial on a daily basis, which is more expensive than getting the transcript a few days later. This argument fails because the City established that it obtained the transcripts for use during the trial. Moreover, several courts have taxed the cost of daily transcripts where, in cases like this one, the trial was lengthy and complex. See Holmes v. Cessna Aircraft Co., 11 F.3d 63, 64 (5th Cir. 1994) (per curiam); Galella v. Onassis, 487 F.2d 986, 999 (2d Cir. 1973); A.B.C. Packard, Inc. v. General Motors Corp., 275 F.2d 63, 75 (9th Cir. 1960); United States v. Davis, 87 F. Supp.2d 82, 88 (D.R.I. 2000); EEOC v. Sears, Roebuck and Co., 114 F.R.D. 615, 622 (N.D. Ill. 1987).

/4 Plaintiffs also challenge the district court's

imposition of costs for photocopies, exhibits, and expenses related to the City's affirmative defenses. Having reviewed the record, we find no error in the district court's decision to tax these costs. Similarly, we are not persuaded by plaintiffs' argument that the district court applied an incorrect burden of proof because any such error was harmless.